## D. M. FULTON *v.* F. E. WOODMAN.

1. FRAUDULENT CONVEYANCE. *Priority of lien. Case in judgment.*
    One in a distant State may, through the agency of his son-in-law in this, buy the latter's land sold here at sheriff's sale under a judgment in attachment, and have the title, by mesne conveyances, vested in his daughter, who, obtaining both the title of the debtor, her husband, and the claim of the judgment creditor, will have priority over a purchaser under a chancery decree, rendered, after the levy of the attachment, on a bill previously filed by him against said debtor.

2. SAME. *Purchase with knowledge of debtor's condition to aid his family.*
    In such a case the result is not changed by the fact that the father-in-law, knowing that his son-in-law was hopelessly embarrassed, made the purchase for the purpose of saving something for the latter's family out of the wreck of his estate.

3. SAME. *Purchase in wife's name with debtor's means.*

If, in such a case, the means of the husband, instead of those of the father, had been used in the purchase, *semble*, that the daughter's title would be defeated.

4. PURCHASER BONA FIDE. *Burden of proof.*

The rule that he who sets up a purchase *bona fide* as freeing him from the effects of fraud in a previous holder of the title must prove such defence, applies only when the fraud has been established. It cannot be invoked by unsupported charges.

5. CHANCERY. *Pleading. Answer as evidence.*

A statement in a sworn answer, responsive to a direct interrogatory in the bill, must be accepted as true, until disproved.

6. SAME. *Pro confesso against co-defendant. Conspiracy.*

In the absence of proof to establish a conspiracy to defraud among the defendants to a bill in chancery which charges them with the fraudulent combination, the title of one of them to land cannot be affected by a *pro confesso* suffered by his non-resident co-defendant, who parted with his interest in the property before the bill was filed.

7. GRANTEE MALA FIDE. *Protected by bona fides of his grantor.*

A volunteer with notice, who derives title from a *bona fide* purchaser for value without notice, is unaffected by the fraudulent character of the original sale.

APPEAL from the Chancery Court of Madison County.

Hon. WILLIAM BRECK, Chancellor, did not sit in this case ; but Counsellor CAMPBELL, by agreement, acted as chancellor *pro hac vice.*

*A. H. Handy,* for the appellant, argued the case orally, and filed an elaborate brief, making the following points : —

I. That Strickland, upon the pleadings and evidence, cannot be held to be a *bona fide* purchaser is clear, from the following reasons : —

1. Such defence is a personal privilege to the party who may claim it, and is not available to another claiming under him, and not occupying that position. 2 Sugden's Vendors (ed. 1873), p. 791, § 15. Here Strickland, having conveyed all his interest in the land to his daughter without warranty, sets up no claim against the title of Fulton. He merely states the facts of the purchase, in answer to the interrogatories of the amended bill.

2. Strickland states in his amended answer that he advanced the purchase-money for the land in October, 1869, when he "learned from Woodman, for the first time, that the title to the land was in Cartwright." The sheriff's deed shows that the date of Cartwright's purchase was June 6, 1870. At the time of the alleged advance of money by Strickland to Woodman, "to purchase the land from Cartwright," the latter had not purchased it. If it be said that, though he had not purchased the land, yet the claim and suit of Robinson had been transferred to him at that time, which connected him with the transaction, this pretence must be unavailing, because —

(1.) That is not the position taken in the answer, and Strickland must be held to the substantial matters of fact set up in his answer to justify his title. Story Eq. Pl. § 257 ; *Pinson* v. *Williams*, 23 Miss. 67 ; *Baygents* v. *Beard*, 41 Miss. 531 ; *Bacon* v. *Ventress*, 32 Miss. 158; *Fatheree* v. *Fletcher*, 31 Miss. 265, 271 ; *Prewett* v. *Coopwood*, 30 Miss. 369, 387 ; *Harney* v. *Morton*, 36 Miss. 411, 416 ; George Dig. p. 803, pl. 204 ; 1 Dan. Ch. Pr. (4th Am. ed. 1871) 326, 852, 853.

(2.) It is clear from this answer, the exhibits annexed to it and the proof, that at the time of Strickland's interview with Woodman, in October, 1869, Cartwright had no interest in the business, and that this was the first pretence of his connection with it.

3. Strickland's answer did not cast on the appellant the burden of proving that his funds were not applied to the purchase of the land, which is the ground on which the defence is rested. On the pleadings, that burden was on Strickland or Mrs. Woodman. The amended bill charges that the deed from Cartwright to Strickland was not made in good faith, and for a valuable consideration. Strickland, in answer to special interrogatories, states that he advanced the money to Woodman, but had no knowledge that it was in fact paid to Cartwright; but he proceeds to say that it was paid to Cartwright by Woodman, as he was informed by Woodman. It is well settled that such an answer was matter of avoidance, which it was incumbent on the defendant to prove. *Miller* v. *Lamar*, 43 Miss. 391 ; *Dease* v. *Moody*, 31 Miss. 617 ; *Brooks*

v. *Gillis*, 12 S. & M. 538 ; *Hart* v. *Ten Eyck*, 2 Johns. Ch. 89, 90 ; *Petrie* v. *Wright*, 6 S. & M. 647.   There being no evidence of the payment to Cartwright, the matter stands wholly on the admission that the funds were paid by Strickland to Woodman.

4. The *pro confesso* against Cartwright is evidence against Strickland, under the circumstances of the case, on several grounds : —

(1.) An answer or admission of a defendant is admissible as evidence against his co-defendant in a matter where the co-defendant claims property under him ; as where one defendant succeeds to the right of another.   1 Greenl. Evid. § 178 ; *Osborn* v. *United States Bank*, 9 Wheat. 738, 832 ; *Fitch* v. *Stamps*, 6 How. (Miss.) 487 ; *Field* v. *Holland*, 6 Cranch, 8, 24, 25. The case of *Halloway* v. *Moore*, 4 S. & M. 600, is not contrary to this doctrine, as applied to the relations of the parties in this case ; and, if it can be so considered, it is opposed to the settled rule, and especially to *Fitch* v. *Stamps, ubi supra.*

(2.) The facts stated in the bill show combination and complicity between Cartwright and his co-defendants, which render the admissions of one of the parties admissible against the others.   14 Wis. 489 ; 1 Rawle, 362, 458 ; 6 Rand. 285 ; 3 Car. & P. 395 ; 10 Serg. & R. 419 ; 11 Wend. 536 ; 12 Wend. 41 ; 3 Day (Conn.), 33.

(3.) The declarations of Cartwright are set up in the answer of Mrs. Woodman to justify the transaction ; and the *pro confesso* as to facts embraced by these alleged representations, even if not evidence for any other purpose, is admissible as a circumstance to show the combination and fraud, and as a judicial confession of the falsehood of those alleged representations.   1 Greenl. Evid. § 178.

(4.) Though it is true that the *pro confesso* might not be sufficient of itself to set aside the deeds, yet it is admissible in evidence, and must be taken together with the other evidences of fraud and collusion shown.   2 Johns. Ch. 43.

5. That Woodman continued in the use and possession of the property after the sale and during his life, is alleged in the original bill ; and, not being denied by the answers, is to be taken as true, under our statutory rule.   This continued pos-

session and use are sufficient to show that the transaction was not *bona fide ;* and unless explained by evidence, so as to remove all doubt of its fairness, the legal presumption of fraud arising therefrom must prevail. *Collins* v. *Bush,* 9 Wend. 198; *Fonda* v. *Gross,* 15 Wend. 628; and the great leading American case of *Hildreth* v. *Sands,* 2 Johns. Ch. 45, 46; *Kuykendall* v. *McDonald,* 15 Mo. 416; *Davis* v. *Turner,* 4 Gratt. 422; *Grant* v. *Lewis,* 14 Wis. 487, 489, 490; 12 S. & M. 369, 390; 14 Wis. 489; 1 Johns. Ch. 478; 4 Johns. 387, 393; *Twyne's Case,* 3 Coke, 80 (2d Resolution); s. c. 1 Smith L. C. 33; *Bates* v. *Graves,* 2 Ves. Jr. 291; *Farmers' Bank of Va.* v. *Douglass,* 11 S. & M. 469; 15 Mo. 419, 420. The presumption of fraud is confirmed by Strickland's deed to Mrs. Woodman being a mere quitclaim, which shows that he suspected the validity of his title and was unwilling to warrant it to his daughter, who claims to have paid him a valuable consideration. 11 Wall. 217; 3 How. (U. S.) 410; 33 Miss. 292; 2 How. (Miss.) 601.

6. The statements of Strickland as to the amounts advanced by him are inconsistent. At the time of the advance, neither the purchase of Robinson's notes nor of the land had been made; for, if either had been made, the amount would have been fixed, must necessarily have been known to Strickland, and he could without difficulty have stated it. This uncertainty and improbability about that amount must cast a deep suspicion on his entire connection with the business.

7. But why was the conveyance of the lands or the assignment of Robinson's paper made to Cartwright? No explanation of this strange proceeding is attempted, except in Mrs. Woodman's answer to the amended bill, alleging " that the land was bought in Cartwright's name " — as she has heard from him since the commencement of this suit — " merely for purposes of convenience, and that a conveyance from him would be more susceptible of explanation than if bought in any other way." How is it that the purchase in Cartwright's name would be more susceptible of explanation? He was a perfect stranger to Strickland; had. nothing to do with the purchase of Robinson's notes, or with the purchase at sheriff's sale; paid no money for either, so far as pretended or shown; received

no deed from the sheriff; and, finally, he refuses to answer the amended bill, and permits its charges and interrogatories to be taken as confessed! The true explanation is plain. The design was to conceal the fraudulent purpose of Woodman — the active manager of the whole arrangement — to secure the property to the benefit of himself and of his family. Hence inquiries by others were to be thwarted. As said by Chancellor Kent, in *Sands* v. *Codwise*, 4 Johns. 567, "This over-caution is one of the settled *indicia* of fraud. It evinces a diffidence in the rectitude of the transaction, and excites a correspondent solicitude to provide defences for its protection." If it be said that Strickland had no actual notice of this, we reply, first, that this is inconsistent with the statement in the answer, and is inadmissible; secondly, that Woodman was his agent in the matter, as he alleges, and notice to his agent was notice to him. 2 Sugd. Vend. (Am. ed. 1873) p. 756; *Ross* v. *Houston*, 25 Miss. 591.

II. Mrs. Woodman cannot occupy the position of a *bona fide* purchaser.

1. She has never paid the alleged purchase-money; and notice of the invalidity of the title before its actual payment, although it be secured and conveyance executed, will not avail to constitute her a purchaser without notice. 2 Sugd. Vend. (Am. ed. 1873) 522, 752, and notes; 2 Lead. Cas. in Eq., part 1, p. 45, notes to *Basset* v. *Nosworthy*, 8 Wheat. 421; 1 Sumner, 506, 517; 17 Ind. 108. The quitclaim deed states the consideration paid to be $500; and both her answer and that of Strickland show that this sum consisted of her promissory note to him, which has not been paid. She is bound by the consideration stated in the deed; and, so far as the rights of third parties are concerned, she cannot set up any other. *Hildreth* v. *Sands*, 2 Johns. Ch. 45; *Jackson* v. *Delancey*, 4 Cow. 427.

2. Her alleged title rests on the quitclaim deed, which shows that it was considered questionable by both parties; and it is firmly settled, that, under such a deed, a party cannot set up the claim of a purchaser *bona fide* and without notice as to the rights of others. 33 Miss. 292; 2 How. (Miss.) 601; 11 Wall. 217, 232; 3 How. (U. S.) 410. This quitclaim was

not made until long after Fulton's deed was recorded; and though bearing date Sept. 15, 1873, was not recorded within the time after its execution required by the statute, nor until Aug. 19, 1874, — about six months after this suit was brought, when it became necessary by that exigency.

*Henry S. Foote, Jr.*, for the appellees, filed the written opinion of the learned counsellor who presided in the lower court, and submitted the case, without other brief or argument.

CHALMERS, J., delivered the opinion of the court.

On Aug. 17, 1868, David M. Fulton, the complainant below and appellant here, bought at sheriff's sale a certain tract of land in Madison County, belonging to Ivory F. Woodman, known as the Sanders place. The sale took place under and by virtue of a decree in chancery, rendered on Feb. 23, 1867, in favor of Fulton and against Woodman, for $35,507. At and before the time of the rendition of this decree there was pending in the Circuit Court of Madison County a suit for about $10,000, brought against Woodman by one Robinson, which had been commenced by attachment, and in which the attachment writ had been levied on the Sanders place on June 29, 1866. The lien of this attachment, therefore, if it should ripen into a judgment, was superior to the title obtained by Fulton under his decree. A few days before Oct. 26, 1869, Woodman effected an arrangement with Robinson, whereby he surrendered to him an amount of his, Robinson's, own paper equal to the amount of Robinson's claim against him, Woodman, upon which the attachment suit was based; and thereupon Robinson, at the suggestion and request of Woodman, transferred and assigned all interest in said suit to one Cartwright, a friend of Woodman's, resident in New Orleans, in which city Woodman also resided.

This transaction occurred in the town of Canton. Cartwright was not present. Robinson did not know him, and had no intimation that he had any interest in the negotiation until it came to be consummated, when, as before stated, Woodman requested that the transfer might be made to him. A few days after the transfer, to wit, on Oct. 26, 1869, judgment was rendered in favor of Robinson against

Woodman for $11,131.18; and *venditioni exponas* having issued thereon, directing the sale of the land attached, the Sanders place was by the sheriff put up and sold, on June 6, 1870, and bought in by Woodman for Cartwright for the sum of $5,557.50, and a sheriff's deed delivered to Woodman, conveying the title to Cartwright. Twenty-two days thereafter, to wit, on June 28, 1870, Cartwright conveyed the land by deed to Isaac Strickland, the father-in-law of Woodman, a resident of the State of Maine, for the expressed consideration of $5,357. These deeds were promptly recorded. Strickland, after holding the legal title about three years, Woodman having in the mean time departed this life, conveyed it by quitclaim, on Sept. 15, 1873, to his daughter, Mrs. Frances E. Woodman, for the expressed consideration of $500. This quitclaim was not recorded until after the institution of this suit, but Mrs. Woodman was in possession of the land. On March 30, 1874, Fulton filed his bill of complaint against Cartwright, Strickland and Mrs. Woodman, and subsequently, by leave of court, filed an amended bill. The substantial averments of these bills are, that the arrangement by which the Robinson suit was transferred to Cartwright was procured and brought about by Woodman, for the purpose of placing the title to the Sanders place in the hands of friends and relatives, to be held by them for the benefit of himself and family, and to place it beyond the reach of his creditors, and especially to defeat the collection of the complainant's claim, and to shield the property from the operation of the complainant's decree and his deed thereunder. It is charged that the Robinson claim was bought with Woodman's own means, and that the use of Cartwright's name was a fraudulent device, and without the advancement of any money by him, either in the purchase of the claim or the purchase of the land at sheriff's sale; that the subsequent conveyance by Cartwright to Strickland was part of the same fraudulent conspiracy, was collusive and colorable only, and that in point of fact, as Cartwright had himself paid out no money, so he received none from Strickland; that Strickland's conveyance to his daughter, Mrs. Woodman, was also fraudulent, and in furtherance of the same scheme, and was without any consideration deemed valuable in law.

The bill was accompanied by most exhaustive and searching interrogatories, directed to all the defendants, requiring them to disclose fully and minutely their several connections with the matter, and especially calling upon them to declare what money, if any, they had paid out, and when, where, in what manner and to whom they had paid the same, upon what considerations, and under what agreements or understandings, express or implied.

The prayer was, that the several conveyances by which the title to the land had been vested in Mrs. Woodman should be vacated and annulled ; and that possession be decreed to the complainant, under the deed held by him under his decree.

Cartwright, having been duly summoned by publication, made default, and decree *pro confesso* was taken against him.

Strickland answered, denying all fraud, combination or conspiracy, or any knowledge that Woodman had been engaged in an attempt to defraud the complainant or other creditors, or any knowledge that any debt existed from Woodman to the complainant, and earnestly asserting that, if Woodman entertained or practised any such scheme, it was wholly unknown to and unparticipated in by him. He stated that some time in the autumn of 1869 (he believed, in the month of October), Woodman, his son-in-law, who then lived in the city of New Orleans, came to the home of the respondent in the State of Maine, and, telling him that the land in controversy had passed into the hands of Cartwright, urged him to buy it; that he himself had no acquaintance with Cartwright nor with the land, and knew nothing of Woodman's pecuniary embarrassments, but that, trusting solely to Woodman's representations, he yielded to his solicitations, and intrusted him with the sum of about $5,500, with which to make the purchase ; that the funds were advanced partly in cash, partly in United States land-warrants and partly in a check on a Boston bank, — the amount of each being given ; that Woodman left with these means to make the purchase, and that he, the respondent, subsequently received the deed executed by Cartwright ; that at no time did he have any correspondence or negotiations with

Cartwright, the whole matter having been suggested and carried through by Woodman. He stated, further, that, after Woodman's death, he conveyed the land to his daughter, taking her note for $500, which had never been paid; and that his intention was, that the plantation should constitute an advancement to her out of his estate.

Mrs. Woodman denied all fraudulent combination or knowledge; avowed her entire ignorance of the transactions between Cartwright and her husband; had heard the latter state that the land had been bought for her father, by money furnished by him for the purpose. Her own deed from her father had been voluntary on his part, and intended as an advancement, except as to the sum of $250, which her father owed to her from her mother's estate.

There was no proof taken, except the testimony of Robinson and the sheriff of the county, both of whom stated, as indicated above, that they had known nothing of Cartwright, except to make the transfer and deed to him at the instigation and request of Woodman, with whom all their dealings were had. The case having been submitted on the pleadings and this meagre proof, there was decree of dismissal of the bill, from which the complainant appealed.

It is impossible to read the record without coming to the conclusion that the operations by which the Robinson claim was transferred to Cartwright, and the title of the land successively vested in him and Strickland, were originated and carried through by Woodman, for the express purpose of defeating the complainant's decree for $35,507. Exactly how this was managed — that is to say, what exactly was Cartwright's connection with it — cannot be accurately ascertained, because of the death of Woodman and the failure of Cartwright to answer or testify. If Cartwright furnished the money with which the Robinson claim was purchased, and subsequently conveyed the land to Strickland upon receiving back his money from the latter, there was no fraud committed of which Fulton can complain, even though it was understood between Cartwright and Woodman, in advance, that this should be done, and even though Cartwright knew that the effect of the transaction would be to defeat the just debt of the complainant. Robin-

son's claim on the land by virtue of his attachment was adverse and superior in lien to that of the complainant. The title of the latter under his decree must necessarily have been defeated by a sale under the attachment, no matter who became the purchaser thereat, provided only that Woodman himself was not such purchaser. The acquisition of Robinson's claim, or a purchase at a sale thereunder, was open to the complainant as well as to all the world. He knew, or was by law bound to know, of the pendency of that suit and of its superior dignity to his own ; and he was free either to purchase it, or, if he feared to venture his money upon its uncertain result, he was free, after it had ripened into a judgment, to attend the sale and make the property bring something more than its amount. His facilities for running the property up, without cost to himself, after the biddings had passed the amount due on the judgment, would have been bounded only by the $35,507 due to himself, since his was the next lien. If, however, the property was only worth the amount of the Robinson judgment, or less, then he cannot claim to have been damnified by its sale therefor, because there was no possible way to make his decree effective save by a satisfaction of that judgment. If Cartwright knew all these things, and, for the purpose of befriending Woodman, bought in the Robinson claim, and subsequently the land itself, and held the same until the father-in-law took it off his hands, we fail to see in this any thing of which the appellant can justly complain. Such transactions are quite common, and we know of no principle which forbids them. The buying in and holding up of a mortgage upon which a friend is pressed is a matter of every-day occurrence, and, unless the indulgence is unreasonably extended, other creditors cannot complain : they may, perhaps, under some circumstances, force a foreclosure, but they cannot defeat the mortgage. Transactions like this stand upon a different footing from dealings with the insolvent debtor in person, by which some benefit is reserved to him. They are dealings with a creditor who holds a debt superior to all others, which he can enforce or not at his own pleasure, and at whose indulgence or remorselessness other creditors will not be heard to murmur.

In the case under consideration, if Robinson had retained his claim, he could have granted indulgence after judgment; or, having sold and bought in the land under the *venditioni exponas*, he could have conveyed it to Strickland, or directly to Woodman, with or without a consideration ; and Fulton could not be heard to object. Whatever Robinson could do, his assignee could do ; nor would this right be affected by reason of any indulgence shown Woodman, even though the assignment was procured with the express purpose of granting such indulgence. There was one man, and one man only, who could not, by a purchase of the Robinson claim, so use it as to defeat the complainant. That man was Woodman himself. If the purchase was made by him, or by any one for him, with his means, the title inured to the benefit of his creditors. Fully aware of this principle, the complainant directly asserts in his bill that it was so made. The charge is as directly denied by the defendants in their answers. This, then, is the issue fairly made up between the parties.

Counsel for the complainant correctly asserts that in the attitude of the pleadings it is mainly a question as to where rests the burden of proof. We cannot agree with him in thinking that it is devolved upon the defendants. The complainant has asserted, and the law compelled him to assert, in order to make good his case, that Woodman, with his own means, bought up the Robinson claim, and used it to obtain the land. Having charged this, he proceeds to put to the defendants a series of most searching special interrogatories, calling upon them to disclose, upon their several corporal oaths, their entire information about and connection with the matter, and, if they shall pretend that the land was bought with their means, to state particularly when, how, and to whom they paid the same. Their responses are as direct as his interrogatories were categorical. Their answers are as broad as his charge was sweeping. They deny, in the most emphatic and unqualified manner, that any portion of Woodman's means was in any manner invested in the land. Strickland tells, with great minuteness, when, how and in what manner his own money went into the purchase. He is not able, indeed, to swear of his own knowledge that his money was actually handed to

Cartwright, because it was transmitted by the hands of another; but he does swear that he gave the money to Woodman for the purpose of buying the land from Cartwright; and it is shown that in due time the latter made a deed whereby, for an amount of money corresponding with that transmitted by Strickland, the land was conveyed to him. This is, we think, a sufficient reply to the interrogatory as to how and to whom he paid the money.

Much stress is laid by counsel upon the discrepancy shown to exist between Strickland's statement that he authorized Woodman to buy the land from Cartwright in the autumn of 1869, and the fact disclosed by the record that Cartwright had no title to the land until the sale under the *venditioni exponas,* in June, 1870. But Cartwright owned the claim and judgment from and after Oct. 26, 1869; and this was equivalent to ownership of the land. Woodman, therefore, representing the effect of the judgment rather than the judgment itself, might well speak of Cartwright as the owner of the land. We think the variance between the answer and the proof by the deeds in this respect is immaterial. It is insisted, however, that Strickland's answer is shown to be false, because he states that Woodman came to his house to procure the money in October, 1869; whereas, it being proved that Woodman was in Canton on the 26th of that month, it was impossible for him to have gone so quickly to Maine. Woodman is not shown to have been in Canton on the 26th of October, but a few days previous thereto, at which time he received from Robinson the transfer to Cartwright. He had, therefore, ample time to have gone to Maine during the month; and, even though it could be shown that he did not arrive there until some time in November, it would not be sufficient to cause a rejection of Strickland's answer.

The date in October at which Woodman was in Maine being unknown, it is possible that his visit there may have preceded the transfer by Robinson to Cartwright, and that, in point of fact, it was Strickland's money, and not Cartwright's, with which was purchased the paper received by Robinson as the consideration of the transfer. If this be so, it is impossible to account satisfactorily for the use of Cartwright's name, except upon the

presumption that it was used by Woodman with some design of concealing and secreting what he considered a fraudulent transaction. If he was the crafty and unscrupulous man that he is charged to have been by the complainant, nothing is more probable than that, fearing that the use of his father-in-law's name might throw suspicion over the transaction, he substituted that of Cartwright, who had no real interest in the matter. If this be so, it is only an illustration of the truth that designing men frequently plot and counterplot to accomplish, by indirection, that which can be best accomplished openly and directly. Though Woodman may have thought otherwise, there was nothing to prevent Strickland from buying Robinson's judgment or the land sold thereunder in his own name with the express and avowed intention of giving it to his daughter; nor was there any thing to prevent this being done through Woodman as his agent. A father-in-law in a distant State may, through the agency of his son-in-law, buy the land of the latter sold at sheriff's sale, and have the deed made to his daughter. In such case the daughter will obtain both the title of her husband and the claim of the judgment creditor; and her title will therefore defeat all claims inferior in dignity to the judgment under which the sale took place.

Counsel for the appellant argues that if Woodman's purposes were fraudulent, Strickland, his principal, will be affected by the fraud, and also that the principal will be held to know all that his agent knew. We reply that Strickland would have had a perfect right to do what he did, if every circumstance relating to the transaction had been laid before him. We mean that if he had known, as he swears that he did not, that his son-in-law was hopelessly embarrassed, and that something could be saved for his family out of the wreck of his estate by buying in a claim which was superior to all others outstanding against him, he would have had a perfect right to make the purchase for that purpose. As before remarked, the whole equity of the complainant's case rests upon the assertion that the land was bought with Woodman's money. If this has not been established, he has no case. There can be no question of good faith or bad faith in Strickland and Mrs.

Woodman, until this fundamental proposition has been substantiated. No matter what their knowledge or purpose was, the complainant is in no position to attack them, until he has legally proved that the means of his debtor have been invested in the land. Has this been established? If so, how? He has positively asserted, and the defendants as positively deny it. Upon whom rests the burden of proof? The complainant contends that the claim of being a *bona fide* purchaser is an affirmative defence, and that, therefore, the burden of proving it is upon him who pleads it. This is only true where fraud in some previous holder of the title has been shown. In such a case, the defendant who sets up the claim of a *bona fide* purchase in himself, as freeing him from the effects of the fraud, must prove this affirmative claim. But it surely requires no argument to show that, in order for this principle to come in play, the previous fraud by which the title has been vitiated must be established, and that this cannot be accomplished by charges without proof. It would be most unjust, as well as most illogical, to hold that, because the complainant has asserted that Woodman's means were invested in the land, the burden of showing that they were ignorant of the fraud was devolved upon all subsequent holders.

It is claimed that the acknowledged facts and circumstances establish the purchase of the land by Woodman's means. We think, on the contrary, that, taking the answers of the defendants to be true, they establish exactly the reverse. Certainly, it will not be denied that we must assume it to be true that Strickland gave $5,500 to Woodman for the purpose of buying the land, because this statement, being made by the former in response to a direct interrogatory from the complainant on the subject, must be accepted as true until the contrary is shown. If given before the transfer of the Robinson claim, the most reasonable inference is that it was invested in the purchase of the paper which constituted the consideration of the transfer. If given after the transfer, it is alike reasonable to presume that it went into a purchase of the land. If we accept neither of these theories, we are left to believe that Woodman, having sufficient means of his own with which to make the purchase, and having actually so invested them, obtained this money

from his father-in-law for no purpose whatever connected with the land.   This is the inevitable, though illogical, conclusion into which, upon the complainant's theory, we are driven by the legal rule which requires us to accept as true Strickland's statement that he furnished this money to Woodman for the purpose of making the purchase.

Counsel for the complainant insists that the fraud is established against Cartwright by the *pro confesso* taken against him, and that this may be used as evidence against his co-defendants, just as the answer of one of several defendants may be used against the others in cases of conspiracy.   Counsel forgets that the very foundation of the rule is that participation in the conspiracy must first be established upon the part of the defendant against whom it is proposed to use the answer.   In the case at bar Cartwright had no sort of interest in the subject-matter of the litigation, having conveyed his title several years before, and therefore, we may presume, did not put himself to the trouble and expense of answering.   It would be monstrous to hold that a man's title to land can be affected by filing a bill charging him with fraudulent practices in connection with a non-resident who has no interest whatever in the property, and then claim that a *pro confesso* suffered by such non-resident establishes the conspiracy and makes all the allegations of the bill evidence against the real parties in interest.

As to Strickland, we are of opinion that by the deed from Cartwright he acquired both the title of Woodman and the rights of Robinson under the attachment lien, which latter, being superior to the complainant's rights under his decree, must prevail over it, unless it can be shown that the means of Woodman, and not of Strickland, were invested in the purchase.   To support this assumption, we have charges and arguments only without proof.

As to Mrs. Woodman, it is evident that, though a volunteer, and even if in spite of her denials to the contrary we assume her to have been cognizant of any fraudulent designs on the part of her husband, her title, derived from Strickland, must be as good in her hands as we have seen that it was in his.

Upon the whole case, we are of opinion that the complainant, having set the case down for hearing, practically without

proof, when the burden of overcoming the sworn denials of the answers rested upon him, necessarily fails.

The decree dismissing the bill is          *Affirmed.*

CAMPBELL, J., who had decided this case in the court below, forbore participating in its determination.